# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

───────────────

Nº 10-cv-3660(JFB) (WDW)

───────────────

## DEBBIE ZAGAJA

Plaintiff,

VERSUS

## VILLAGE OF FREEPORT and ANDREW HARDWICK,

Defendants.

───────────────

**MEMORANDUM AND ORDER**
November 20, 2012

───────────────

JOSEPH F. BIANCO, District Judge:

Debbie Zagaja ("plaintiff" or "Zagaja") brought this action against the Village of Freeport ("Village") and Andrew Hardwick ("Hardwick") (collectively, "defendants"), alleging violations of her constitutional rights pursuant to 42 U.S.C. § 1983, employment discrimination on the basis of gender, race and/or color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII") and Article 15 of the Executive Law of the State of New York §§ 290 and 296 (the "Human Rights Law"), and employment discrimination based on race in violation of 42 U.S.C. § 1981. Plaintiff claims that she was the subject of gender, race, and/or color discrimination arising from harassment, a hostile work environment, her demotion, and defendants' failure to promote her to a command staff position. Plaintiff also claims that she was

retaliated against in response to her protected activities under these statutes.

Specifically, plaintiff, who is White and female, has been working in the Freeport Police Department ("FPD") since 1986. She was promoted to Lieutenant in 2002 and selected as Deputy Chief in 2007. Plaintiff claims that "her upwardly mobile career with the FPD was ripped away from her, solely based on her race and gender." (Pl.'s Mem. at 1.) She asserts that once defendant Hardwick became Mayor of the Department, he "instituted a practice of hiring unqualified, inexperienced minorities and terminating qualified White and female employees, including demoting Plaintiff and skipping her over for promotions within the command staff." (*Id.*) Plaintiff additionally claims that, "after making numerous complaints including this lawsuit, [she] has been subjected to a hostile work environment and retaliation." (*Id.*) In sum,

plaintiff contends that she was "(1) qualified to retain her position as a Deputy Chief but was demoted because of her race and gender; (2) was denied a promotion to Assistant Chief of Police because of her race and gender and in retaliation for her complaints; (3) was denied a promotion to Chief of Police because of her race and gender; and (4) suffered gender discrimination by being denied equal facilities." (*Id*. at 4.)

As discussed herein, plaintiff has pointed to several categories of evidence to support her race, gender, and ethnicity discrimination claims. First, plaintiff points to the fact that when she was demoted by Hardwick from the Deputy Chief position, she was replaced by someone – Miguel Bermudez, a Hispanic male – who scored 10 points lower than her on the Lieutenant's exam. Bermudez even testified that he was less qualified than plaintiff for the position, and Assistant Chief Gros stated that, based upon his thirty-two year career in law enforcement, he believes plaintiff's demotion was "inexplicable." According to plaintiff, the Village Attorney advised her that upon becoming Mayor, Hardwick wanted to replace the then current command staff with "his people."

Second, with respect to the Chief of Police position, there is evidence that Hardwick referred to Bermudez as "Chief," even when Bermudez was ineligible for the position. There is also evidence that efforts were made, including a lawsuit, to forego or modify the civil service examination for the Chief of Police position so that Bermudez could qualify for appointment to the position. Hardwick testified that the purpose of the lawsuit was to reach minority candidates for supervisory positions. The requirements were in fact changed and, as a result, Bermudez qualified for the position. Although plaintiff did not score in the top

three on the examination, and Bermudez did, plaintiff contends that the other two top scorers were not interested in becoming Chief of Police, and if the Village had canvassed those candidates, plaintiff would have moved up to the top three and been eligible for the Chief position.

Third, with respect to the Assistant Chief of Police position, Hardwick did not promote plaintiff to that position, but rather sought to appoint a Black female candidate, Zina Leftenant, who, according to Bermudez, was "grossly unqualified" for the position. There is evidence that the Board of Trustees refused to promote Leftenant to a command staff position as Hardwick wished. As a result, Hardwick created a new position for Leftenant and the Assistant Chief Position still remains vacant.

Fourth, with respect to the Deputy Chief position, in December 2010, a male candidate, Raymond Horton, was promoted to that position after being a Lieutenant for only eleven days. Prior to the promotion, Horton sent an email to plaintiff stating, "YOU'VE BEEN WRONGED" and "I am currently sickened by the current state of affairs that has [sic] thrust upon you." Horton testified that he was referring to plaintiff's removal from the Deputy Chief position.

Fifth, plaintiff has submitted evidence of other White supervisors who, according to plaintiff's evidence, Hardwick replaced with less qualified minority candidates. This includes the Superintendent of Buildings, the Superintendent of Public Works, the Director of Community Development, the Assessor, the Research Assistant to the Board of Trustees, the Director of Human Resources, and the Treasurer.

Sixth, plaintiff has submitted statistics showing that since Hardwick's election as

Mayor in April 2009, one hundred and fifty employees have been hired. Of the one hundred and fifty employees hired, only fifty were White, while ninety-six were Black or Hispanic, and only fifty-eight were female, while ninety-two were male.

With respect to her retaliation claims, plaintiff has pointed to evidence that the Assistant Chief of Police position still remains vacant, even though plaintiff is available and qualifies for the position. Plaintiff has also pointed out that, when Bermudez was asked at his deposition why plaintiff has not been promoted to a command staff position, he answered that he no longer trusts plaintiff because of allegations she made in the complaint she filed in this case. Bermudez also testified that he no longer trusts plaintiff because she tape-recorded conversations without his knowledge, even though there is evidence that Horton similarly taped an employee to protect himself and later became Deputy Chief. Plaintiff also put forth evidence of other conduct by the Village, including a financial background check the Village conducted of plaintiff, which she asserts is retaliatory.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, as well as orally on the record on August 13, 2012, the Court grants in part and denies in part defendants' motion for summary judgment. In particular, construing the evidence in plaintiff's favor, there are disputed issues of material fact with respect to the discrimination and retaliation claims that preclude summary judgment on such claims. In other words, if plaintiff's testimony and evidence is credited and all reasonable inferences are drawn in her favor, a rational jury could find in her favor on these claims. Similarly, those same issues of disputed fact preclude

summary judgment as to Hardwick on qualified immunity grounds. It is axiomatic that if Hardwick did intentionally discriminate and retaliate against plaintiff, he would not be protected by qualified immunity. However, as discussed herein, defendants' summary judgment motion is granted with respect to the discrimination claim related to the adequacy of the female locker room and the hostile work environment claim.

I. BACKGROUND

A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, exhibits, and respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[1]

1. Plaintiff's Early Career With the Freeport Police Department

Plaintiff is a White, female Lieutenant in the Freeport Police Department. (Defs.' 56.1 ¶ 4.) She began working for the Department in approximately July 1986, (*Id.* ¶ 5), after graduating from SUNY Albany with a bachelor's degree in psychology and sociology. (Valli Declaration ("Valli Decl.") Ex. 2, Zagaja Deposition Transcript ("Zagaja Dep.") at 8-9.) Plaintiff attained

---

[1] Although the parties' Rule 56.1 statements contain specific citations to the record to support their statements, the Court cites to the Rule 56.1 statements, rather than to the underlying citations to the record.

the rank of Sergeant in approximately March 1993. (Defs.' 56.1 ¶ 6.) Plaintiff took the Lieutenant's exam in September 1995 and was one of the top three scorers. (Valli Decl. Ex. 11, Letter from Civil Service Commission.) Plaintiff took the Lieutenant's exam in September 2000 and scored number one. (Valli Decl. Ex. 12, List of Test Scores from Civil Service Commission.) On July 10, 2002, the certified list of test scores showed that plaintiff's number one score on the Lieutenant's exam was ten points higher than Miguel Bermudez and twelve points higher than Raymond Horton. (Valli Decl. Ex. 13, Test Scores from Civil Service Commission.) In August 2002, plaintiff was promoted to the rank of Lieutenant. (Defs.' 56.1 ¶ 7.)

At his deposition, the former Chief of Police, Michael Woodward, testified that at one point he approached the Mayor and the Village Board asking that they approve plaintiff's promotion to Deputy Chief. (Valli Decl. Ex. 1, Woodward Deposition Transcript ("Woodward Dep.") at 22-23.) Plaintiff was selected as Deputy Chief in May 2007. (Defs.' 56.1 ¶ 9.) Upon her promotion, plaintiff received a salary increase, the title of Deputy Chief, a command staff position, increased benefits, and increased responsibilities in running the Department. (Valli Decl. Ex. 19, Freeport Police Department Personnel Order; Zagaja Declaration ("Zagaja Decl.") ¶¶ 60-61.) According to Woodward, the position of Deputy Chief is one of the three command staff positions in the Department, the other two being Chief of Police and Assistant Chief of Police. (Valli Decl. Ex. 1, Woodward Dep. at 16-17.) Woodward testified that plaintiff was an "excellent" Deputy Chief, that he had absolutely no complaints about plaintiff's work, and that he could not recall any complaints from others about plaintiff's performance in her role of Deputy Chief. (*Id.* at 24-25.)

Woodward also testified that plaintiff often acted in the role of Assistant Chief in Gros' absence and in the role of Chief of Police in Woodward's absence. (*Id.* at 26.)

While the ranks of Lieutenant and Sergeant are civil service titles, the rank of Deputy Chief is an in-house designation. (Defs.' 56.1 ¶¶ 8, 10). Thus, while plaintiff served as Deputy Chief, her civil service rank remained Lieutenant because the Deputy Chief position is not a recognized civil service position in Freeport. (Zagaja Decl. ¶ 46.) Hardwick states that plaintiff's in-house designation of Deputy Chief was governed by a contract. (Hardwick Affidavit ("Hardwick Aff.") ¶ 6.) Plaintiff states that the designation was not governed by a contract, but rather that the benefits associated with the designation were governed by contract. (Zagaja Decl. ¶ 41.) Plaintiff's contract expired on February 28, 2010. (Hardwick Aff. ¶ 6.) According to Hardwick, plaintiff's contract did not provide for renewal once it expired, nor did it provide for plaintiff to remain as Deputy Chief after February 28, 2010. (*Id.*) Plaintiff contends, however, that following the expiration of her contract, she was to continue in her position of Deputy Chief or be promoted within the command staff. (Zagaja Decl. ¶¶ 41-42, 45.)

2. Hardwick's Personnel Changes

In or about April 2009, Hardwick commenced his term as Mayor of the Village of Freeport. (Hardwick Aff. ¶¶ 1, 5.)

According to John Maguire, a Village of Freeport employee, Joseph Madigan was previously employed by the Village as the Superintendent of Buildings. (Valli Decl. Ex. 23, Maguire Aff. ¶ 17.) Madigan held this position for over a decade, until he was demoted by Hardwick. (*Id.*) Hardwick promoted Richard Brown as the new

Superintendent of Buildings. (*Id.*) Brown is a Black male who, according to Woodward, "probably has more building code violations than any other house in Freeport." (Valli Decl. Ex 1, Woodward Dep. at 136.) Brown also has a tax lien on his house. (Valli Decl. Ex. 24, Public Notice of Tax Lien.)

At his deposition, Woodward testified that Lou DiGrazia was previously employed as the Superintendent of Public Works. (Valli Decl. Ex 1, Woodward Dep. at 136.) According to Woodward, DiGrazia was replaced by Scott Richardson, a Black male "who literally went from cutting grass to becoming the Superintendent of Public Works almost overnight." (*Id.* at 136.)

According to Maguire, Ellen Kelly, previously employed as the Director of Community Development, was asked by Hardwick's administration to retire early. (Valli Decl. Ex. 23, Maguire Aff. ¶ 23.) Woodward testified that Kelly was replaced by a Black male. (Valli Decl. Ex. 1, Woodward Dep. at 137.) According to Maguire, Norman Wells, the Black male who replaced Kelly, was a real estate agent with no experience in community development work. (Valli Decl. Ex. 23, Maguire Aff. ¶ 23.)

Bernadine Quinton, a White female, was previously employed by the Village as an Assessor. (Valli Decl. Ex. 23, Quinton Aff. ¶¶ 1, 21.) Hardwick replaced her with James Smith, a Black male. (*Id.* ¶ 9; Valli Decl. Ex. 1, Woodward Dep. at 137-38.) According to Woodward, Quinton was eventually brought back to the Village to help with the assessments after she had been replaced by Smith because Smith could not handle them. (*Id.*)

Maguire stated that Hardwick initially offered him the Chief of Staff position for the Village with a civil service title of

Research Assistant to the Board of Trustees. (Valli Decl. Ex. 23, Maguire Aff. ¶¶ 6-9.) Instead, however, Maguire was relocated in his position and stripped of all access to email and internal documentation for the Village. (Valli Decl. Ex. 25, December 10, 2009 Email from Lieutenant Barella.) Maguire was replaced with Daihanna Torres-Lopez, a Hispanic female, who, according to Maguire, previously held the position of Director of Human Resources but had to be removed because she was caught using her Village employment for personal advancement. (Valli Decl. Ex. 23, Maguire Aff. ¶ 22.)

Raymond Straub was previously employed by the Village as the Executive Director of Human Relations. (Valli Decl. Ex. 6, Byers Deposition Transcript ("Byers Dep.") at 68.) He was terminated by Hardwick and replaced with Torres-Lopez, who, as noted above, was transferred out of the position after she was caught using her position for personal gain. (Valli Decl. Ex. 23, Maguire Aff. ¶ 22.) After Torres-Lopez was transferred, she was replaced by Stafford Byers, a Black male, (Valli Decl. Ex. 6, Byers Dep. at 66), who has been caught and reprimanded for sleeping on the job. (Valli Decl. Ex. 5, Colton Deposition Transcript ("Colton Dep.") at 94-95.) Byers' attorney's license has also been suspended for professional misconduct, for mishandling client funds. (Valli Decl. Ex. 6, Byers Dep. at 8-9.)

According to Hardwick, Valerie Montes, a White female, was employed by the Village as Deputy. She was not promoted to Treasurer when Vilma Lancester left. (Pl's. 56.1 ¶ 59.) Hardwick instead hired Ismaela Hernandez, a Hispanic female. (Valli Decl. Ex. 3, Hardwick Deposition Transcript ("Hardwick Dep.") at 143-48.) At his deposition, Hardwick acknowledged that Hernandez was the subject of a criminal

investigation after her appointment because she contacted a business and used her title to persuade that business to engage in personal dealings with her. (*Id.* at 145.)

Since Hardwick became Mayor in April 2009, one hundred and fifty employees, including both full and part-time employees, have been hired.[2] (Valli Decl. Ex. 22, List of Hires Since April 2009.) Of the one hundred and fifty employees, fifty are White and ninety-six are Black or Hispanic (one employee identifies as "Other" and three employees are Multi-racial). (*Id.*) Fifty-eight are female, while ninety-two are male.[3] (*Id.*)

According to plaintiff, Hardwick also replaced various board members throughout the Village's committees. Plaintiff claims that of the seventeen current board members, fourteen White members were replaced by twelve Black or Hispanic members. (Pl's. 56.1 ¶¶ 63-64.) At his deposition, Hardwick testified that "there needed to be a way to reach minority candidates . . . for supervisory positions,"

because he felt as though "minorities had not been moving through the ranks as quickly." (Valli Decl. Ex. 3, Hardwick Dep. at 192.)

### 3. Plaintiff's Demotion from Deputy Chief and Bermudez's Ascension to the Command Staff Circle

Upon becoming Mayor, Hardwick decided that "there was a need to change the direction of the department." (Valli Decl. Ex. 3, Hardwick Dep. at 39.) At his deposition, Hardwick testified that his desire was to in fact institute such a change. (*Id.* at 210). Woodward, a White male, testified that he was forced to retire as Chief of Police once Hardwick entered the office. (Valli Decl. Ex. 1, Woodward Dep. at 60.) Alfred Gros, also a White male and previously employed as Assistant Chief of Police, testified that he too was forced to retire once Hardwick entered the office. (Valli Decl. Ex. 23; Gros Aff. ¶¶ 19-21.)

Plaintiff states that, in October 2009, Colton advised her that Hardwick wanted to replace the then current command staff with "his people." (Zagaja Decl. ¶ 35.) Hardwick felt that plaintiff was "part of the 'old guard', loyal to the prior administration which had appointed her to the Deputy Chief position." (Hardwick Aff. ¶ 24.) Plaintiff was informed in October 2009 that when her contract for Deputy Chief expired on March 1, 2010, it was not going to be renewed. (Valli Decl. Ex. 5, Colton Dep. at 45.) At his deposition, Woodward testified that he felt that the Department would suffer if plaintiff did not remain in the command staff. (Valli Decl. Ex. 1, Woodward Dep. at 35.) Thus, according to plaintiff, in December of 2009, Woodward directed her to perform Acting Chief of Police functions while he used his accrued time. (Zagaja Decl. ¶ 31.) On March 8, 2010, plaintiff was stripped of her higher rank, benefits, and

---

[2] The statistics regarding employees hired since April 2009 that plaintiff puts forth in her 56.1 statement differ from those in the underlying record to which plaintiff cites. Thus, the Court has utilized the numbers based upon its review of the underlying data, rather than plaintiff's 56.1 statement.

[3] Plaintiff also put forth the following statistics regarding employees terminated or separated since April 2009: (1) sixty-six employees were terminated or separated; (2) of the sixty-six, forty-seven are White and nineteen are Black or Hispanic; and (3) thirty of the sixty-six were female and thirty-six were male. (Pl's. 56.1 ¶ 61). However, the Court has not been able to verify these statistics because of unknown abbreviations in the raw data in the underlying record. The Court has therefore not relied on these numbers and, in any event, they are not necessary to consider for purposes of this motion because plaintiff has other evidence that is sufficient to preclude summary judgment.

additional income. (Zagaja Decl. ¶ 63.) Gros, the Assistant Chief of Police at the time, swore that based on his thirty-two years of experience in law enforcement, plaintiff's "demotion and failure to be appointed to a command position [was] inexplicable." (Valli Dec. Ex. 23, Gros Aff. ¶¶ 26-27.)

Bermudez was promoted to Sergeant in 1993 and to Lieutenant in 2008. (Valli Decl. Ex. 4, Bermudez Dep. at 19-20.) At his deposition, Bermudez testified that he is Hispanic and considers himself both Caucasian and a minority. (*Id.* at 7-8.) At an event in October 2009, Hardwick called Bermudez "Chief," even though Bermudez did not hold that title at the time. (*Id.* at 64-65.) Plaintiff declares that Bermudez met with plaintiff in plaintiff's office on November 24, 2009, and told plaintiff that "Hardwick is calling all the shots and wants [Bermudez] as chief." (Zagaja Decl. ¶ 86.) Bermudez told plaintiff that if he became Chief of Police, he wanted plaintiff as his second in command. (*Id.*) At some point in the fall of 2009, Hardwick directed Woodward to include Bermudez on emails regarding command staff decisions. (Valli Decl. Ex. 3, Hardwick Dep. at 55-56.) In the fall of 2009, Bermudez purchased materials to study for the Chief of Police exam.[4] (Valli Decl. Ex. 4, Bermudez Dep. at 65.)

On January 14, 2010, plaintiff interviewed for the Chief of Police position with Hardwick and Deputy Mayor Kennedy. (Zagaja Decl. ¶ 169.) Kennedy told plaintiff during the interview that it was going well and, sometime after the interview, Kennedy told Woodward that plaintiff "nailed" the interview. (*Id.*) Hardwick testified that he interviewed plaintiff for the Chief of Police

position "[b]ecause [he] knew of her from [his] experience in the Village, and because she was one of the Deputies. [He] thought that [Deputies] were Deputies for a reason, so [he] interviewed them. [He] thought that was the right thing to do because they were right there." (*Id.* at 60.) Plaintiff states that Hardwick never asked her about her vision for Freeport. (Zagaja Decl. ¶ 173.) Hardwick testified that, with respect to plaintiff's vision for the Department, Hardwick believed plaintiff wanted the same things as he did. (Valli Decl. Ex. 3, Hardwick Dep. at 51.)

Bermudez also interviewed for the Chief of Police position with Hardwick and Deputy Mayor Kennedy. (Valli Decl. Ex. 4, Bermudez Dep. at 167.) Bermudez testified that he was asked about the direction in which he saw the Department going, and that "most of the conversation was by the Mayor saying what his vision for Freeport was." (*Id.*) Bermudez testified that when asked at the interview who he would choose as his second in command, Bermudez stated that he would select plaintiff. (*Id.* at 168.) Plaintiff testified that Bermudez told her that he barely spoke during his interview. (Zagaja Decl. ¶ 170.)

### 4. Attempts to Forego or Modify the Civil Service Exam

As noted *supra*, Woodward retired as Chief of Police effective November 25, 2010. (Defs.' 56.1 ¶ 34.) The position of Chief of Police is a civil service title. (*Id.* ¶ 35.) Thus, to be eligible for appointment to the position, one must take the civil service Chief of Police examination. (*Id.* ¶ 36.)

On January 27, 2010, the Nassau County Civil Service Commission ("NCCSC") issued an announcement regarding the promotional exam on March 6, 2010 for the Village of Freeport Chief of Police position.

---

[4] As discussed *infra*, at that time, under the existing civil service structure, Bermudez was ineligible for the Chief position.

(Valli Decl. Ex. 41, NCCSC Announcement.) On February 5, 2010, Woodward sent an email to all lieutenants advising them that Karl Kampe, the Nassau County Director of Civil Service, had agreed to grant a waiver, allowing those lieutenants who did not meet the time in grade requirement to sit for the Chief of Police exam with the understanding that they would have to meet the time in grade requirement to be promoted if they passed. (Valli Decl. Ex. 42, February 5, 2010 Email from Woodward.)

On February 8, 2010, Douglas Thomas, Special Counsel for the Village of Freeport, submitted a request for legislation to Arndreia Goodby, Executive Assistant to the Honorable Earlene Hooper, Deputy Speaker of the Assembly. Thomas requested legislation to the following effect:

> Notwithstanding any provision of the Labor Law, [and] Civil Service Law . . . any person who has qualified to be appointed to the position of superior officer of lieutenant or above . . . shall be eligible for appointment to any post or position of superior officer in the Incorporated Village of Freeport, including chief of police, to which he may be appointed by the executive and/or legislature of the State of New York or any of its subdivisions consisting of any county, town, city, village, special district or public authority thereof.

(Valli Decl. Ex. 39, Request for Legislation.)

On February 19, 2010, both Hardwick and Colton submitted letters to the NCCSC advising the Commission that the Village of Freeport would not be participating in the Chief of Police promotional exam. (Valli Decl. Ex. 43, Letters dated February 19, 2010.) Colton informed the NCCSC that any contrary communication the Commission may have received from Village personnel was unauthorized and "does not represent the position of the Village of Freeport." (*Id.*)

On February 25, 2010, an amendment to the exam announcement was issued to allow Lieutenants to sit for the exam even if they did not meet the time in grade requirement. (Valli Decl. Ex. 44, Amendment Announcement.) However, the amendment still required Lieutenants to satisfy the time in grade requirement in order to be promoted if they passed the exam. (*Id.*)

On March 3, 2010, the Village, through its attorneys, petitioned for injunctive relief to enjoin the NCCSC from holding and conducting a promotional exam for Chief of Police for the Village of Freeport. (Valli Decl. Ex. 45, Order to Show Cause.) On that same date, Hardwick submitted an affidavit in which he swore that he never requested that NCCSC issue an exam for the Chief of Police position. (Valli Decl. Ex. 46, Hardwick Aff. In Support of Order to Show Cause ¶ 2.) Hardwick declared that it was Woodward who requested the exam, without the authorization to do so. (*Id.* ¶¶ 4-5.) At his deposition, Hardwick testified that the purpose of the litigation between the Village and the NCCSC regarding the Chief of Police selection process was the following:

> Well, we were pushing to get the law changed, and we knew that there needed to be a way to reach minority candidates in other areas for supervisory positions. Freeport just got its first Sergeant a couple of years ago in the history of the whole town that's a minority, I should say an African American. The selecting process of officers needs to be

changed throughout the state, not just in Freeport.

(Valli Decl. Ex. 3, Hardwick Dep. at 191.) However, when asked whether he believed the selection process in Freeport had previously been racially biased, Hardwick replied,

> No, I'm not saying that at all. What I'm saying is, is that for whatever reason, minorities had not been moving through the ranks as quickly Um, the Deputy, she was, for a long time, the only minority supervisor, that's a problem.

(*Id.* at 191-92.)

On March 5, 2010, Kampe filed an affidavit in opposition to the Village's petition for injunctive relief. Kampe stated that he made arrangements for the Chief of Police exam once he learned that Woodward was considering retirement within the year, and that neither Colton nor Hardwick provided a reason as to why the holding of the exam would be inappropriate. (Valli Decl. Ex. 47, Kampe Affidavit in Opposition to Order to Show Cause ¶¶ 8, 10, 12.)

Kampe stated that the Commission voted to hold the exam and amended its announcement for the exam to "extend eligibility to sit for the examination to all persons in the promotional line without regard to the necessary years in service . . . ." (*Id.* ¶ 15.) Kampe also noted that, at that time, six individuals had filled out applications to sit for the exam. Of those six, three were not then eligible for promotion and would need to serve additional time in their lower grade in order to be promoted. (*Id.* ¶ 18.) Of the three requiring additional time, one would be eligible for promotion in 2011, but the other two would not be eligible until 2012. (*Id.*) According to plaintiff, the three individuals who were eligible both to sit for the exam and to be promoted were plaintiff, Wayne Giglio, and Paul Jurgens. (Zagaja Decl. ¶ 141.) The three who were eligible to sit for the exam but were not then eligible for promotion were Bermudez, Edward Thompson, and Christopher Barrella. (*Id.* ¶ 142.) All six individuals sat for the exam in March 2010. (*Id.* ¶ 144.) Plaintiff stated that the eventual resolution of the lawsuit between NCCSC and the Village was that "the time in grade requirement to be promoted was dropped from 4 years to 1 year." (*Id.* ¶ 146.)

### 5. Bermudez's Promotion to Deputy Chief

In April 2010, Hardwick selected Bermudez for the position of Deputy Chief. (Valli Decl. Ex. 4, Bermudez Dep. at 20.) When Bermudez became Deputy Chief, he received a raise, a Department vehicle, a Department cell phone, higher shift differential pay, and a plainclothes allowance. (*Id.* at 21-24.) Bermudez testified that he considered his move from Lieutenant to Deputy Chief to be a promotion. (*Id.* at 20-21.) Bermudez also testified that at the time of his promotion to Deputy Chief, he was less qualified than plaintiff for the position and had less years of experience than both Giglio and Jurgens, two other candidates for the position. (*Id.* at 72.)

### 6. Process of Selection of Chief of Police

Plaintiff scored fifth on the exam out of the five test takers who passed the test.[5] (Defs.' 56.1 ¶ 38.) Pursuant to the civil service rule of "One of Three," the Village could only choose one of the top three

---

[5] Plaintiff states that she scored number five on the exam due to the settlement of the lawsuit between the Village and the NCCSC – and that if not for the settlement, she would have scored in the top three. (Zagaja Decl. ¶ 148.)

scorers on the exam to promote to the Chief of Police position, unless one of the top three did not want the position, in which case the next highest scorer would be eligible. (Defs.' 56.1 ¶ 39.) Bermudez scored in the top three on the exam for Chief of Police. (Defs.' 56.1 ¶ 43.)

According to Hardwick, none of the top three scorers on the exam withdrew from consideration for appointment to the Chief of Police position. Hardwick asserts that, since plaintiff did not score in the top three, she was not eligible for appointment. (Hardwick Aff. ¶ 12.) However, according to plaintiff, Hardwick and the Village of Freeport did not canvass for the Chief of Police position. (Zagaja Decl. ¶ 149.) Plaintiff states that it was common knowledge in the Department that both Giglio and Thompson did not want the position. (Zagaja Decl. ¶ 151.) Hardwick testified that he did not consider Giglio for the position. (Valli Decl. Ex 3, Hardwick Dep. at 198.) Thus, according to plaintiff, if the Village and Hardwick had canvassed, Giglio and Thompson would have been removed from consideration and plaintiff would have been bumped up to the top three, making her eligible for the Chief of Police position. (Zagaja Decl. ¶ 151.)

At his deposition, Hardwick testified that he did not even consider Christopher Barrella, a White male Lieutenant, for the Chief of Police position, even though Barrella was one of the top three scorers on the exam. (Valli Decl. Ex. 3, Hardwick Dep. at 267-69.) Hardwick did not remember why he did not consider Barrella, but testified that he was not interested in Barrella for the position because he did not know Barrella and because certain community leaders Hardwick spoke to also did not know Barrella. (*Id.*)

As noted *supra*, both plaintiff and Bermudez interviewed with Hardwick for the Chief of Police position. Bermudez was promoted to Chief of Police in November 2010. (Valli Decl. Ex. 4, Bermudez Dep. at 20.)

### 7. Hardwick's Attempts to Place Zina Leftenant in the Command Staff

At his deposition, Hardwick testified that he wanted Zina Leftenant, a Black, female Senior Detective, to be in the command staff. (Valli Decl. Ex. 3, Hardwick Dep. at 42, 209.) Specifically, Hardwick wanted Leftenant to be Assistant Chief or Deputy Chief. (*Id.* at 209-210.) Colton testified that Hardwick was in fact seeking to promote Leftenant to Assistant Chief. (Valli Decl. Ex. 5, Colton Dep. at 99.) Police Officer Tripani recounted that at a fundraiser in April 2010, Hardwick exclaimed, "We will soon have the first African American chief of police in the Village of Freeport, and she's here today." (Valli Decl. Ex. 8, Tripani Deposition Transcript ("Tripani Dep.") at 64-65.) Hardwick was referring to Leftenant. (*Id.* at 65.)

At his deposition, Woodward testified that Leftenant had no administrative experience, no supervisory experience, and no experience in running the day-to-day operations of the Department. (Valli Decl. Ex. 1, Woodward Dep. at 111-12.) Woodward also testified that Trustee White told him that the Board of Trustees refused to promote Leftenant to a command staff position. (*Id.* at 114.) According to Bermudez, Leftenant was "grossly unqualified" to be Assistant Chief. (Valli Decl. Ex. 4, Bermudez Dep. at 111.) Bermudez claims that he informed Hardwick that Leftenant was not qualified for the position. (*Id.*) When asked whether Hardwick wanted Leftenant as Assistant Chief because she was Black, Bermudez

testified that although he could not know all the reasons Hardwick wanted Leftenant in the position, he suspects that her race was one of the reasons, as Harwick had announced at a social gathering that "he was promoting a Black female." (*Id.* at 111-112.)

Bermudez testified that at one point Leftenant lost her weapon, a .380. (*Id.* at 114-15.) When asked about Leftenant losing her weapon, Woodward testified that an officer losing his or her weapon would be considered fairly serious – it would be considered a violation of the rules and regulations of the department. (Valli Decl. Ex. 1, Woodward Dep. at 167-68.) Leftenant was also removed from a drug enforcement unit because her husband at the time, a Corrections Officer, was arrested for selling or assisting in the transportation of drugs from an undercover agent. (Valli Decl. Ex. 4, Bermudez Dep. at 115-16.) At his deposition, Bermudez testified that he does not know what Hardwick knew about these issues regarding Leftenant and that he did not personally inform Hardwick of these issues, but "just told him [Leftenant] wasn't fit for command." (*Id.* at 116.) When Hardwick was asked whether he was aware of allegations that Leftenant had lost her weapon, he testified that he was "told that a gun was taken from [Leftenant's] home, but there's lots of rumors. [He had not] gotten into all of the rumors that [he] hear[d] about police officers." (Valli Decl. Ex. 3, Hardwick Dep. at 211.)

Leftenant currently works in the Community Affairs unit and serves as the liaison between the Chief of Police and the Mayor's office. (Valli Decl. Ex. 7, Horton Dep. at 41.) Woodward and Horton both testified that Hardwick created this new title and position specifically for Leftenant. (Valli Decl. Ex. 1, Woodward Dep. at 112; Valli Decl. Ex. 7, Horton Dep. at 41-42.) Woodward also testified that acting as a liaison to the community normally fell within the duties of Assistant Chief of Police. (Valli Decl. Ex. 1, Woodward Dep. at 111.) The Assistant Chief position is still vacant, however, and Hardwick has not made a decision as to whether he will fill it. (Valli Decl. Ex. 3, Hardwick Dep. at 272-73).

### 8. Hardwick's Appointment of Raymond Horton as Deputy Chief

At his deposition, Horton testified that in October or November 2010, Hardwick spoke to him about being on the command staff and explained that they "ha[d] to get Miguel [Bermudez] some help." (Valli Decl. Ex. 7, Horton Dep. at 64). Horton was then promoted from Detective Sergeant to Lieutenant on December 10, 2010. (*Id.* at 13.) Horton served as Lieutenant for eleven days, at which point he was promoted to Deputy Chief. (*Id.*)

When asked why he chose Horton as Deputy Chief, Hardwick testified to the following: "Because I had known [Horton] a long time, I actually grew up with him. I knew of his police background, highly regarded in the department and in the community. He was a good choice." (Valli Decl. Ex. 3, Hardwick Dep. at 204-05.) Hardwick also testified that Horton's family helped raise him. (*Id.* at 216.)

On March 7, 2010, prior to his promotion to Lieutenant and then to Deputy Chief, Horton wrote the following email to plaintiff:

Deb, I will not even waste your time stating what is painfully obvious. YOU'VE BEEN WRONGED! Your ability as a superior/executive officer and moreover as a person is second to none! I just felt it was important to let you know that I am literally

sickened by the current state of affairs that has thrust upon you. I want you to know that I stand shoulder-to-shoulder with you during this trying time. You're in my prayers. Don't ever give up.

(Valli Decl. Ex. 35, Email dated March 7, 2010.) At his deposition, Horton explained that when he wrote that plaintiff had been wronged, he meant that plaintiff "shouldn't have been removed from that position [of deputy chief], she was a talented person." (Valli Decl. Ex. 7, Horton Dep. at 31-32.) Bermudez also testified that it was "a mistake" to demote plaintiff. (Valli Decl. Ex. 4, Bermudez Dep. at 86.)

### 9. Plaintiff's Complaints Regarding Department Issues and Alleged Retaliation

In the Village of Freeport Police Department, there are currently three locker rooms: (1) a male subordinate officers' locker room; (2) a male superior officers' locker room; and (3) a female locker room that both subordinate and superior female officers share. (Valli Decl. Ex. 48, Floor Plan of Police Station.) Plaintiff states that in early September 2009, after a discipline issue with a female subordinate police officer, she spoke to Woodward and Gros and requested a separate female superior officers' locker room. (Zagaja Decl. ¶ 184.) In 2009, plaintiff had several conversations and communications regarding her request for a separate female superior officers' locker room. (*Id.* ¶¶ 205-211.) Plaintiff states that she continued to make similar requests in 2010 and 2011. (*Id.* ¶¶ 205-211.) Plaintiff was and currently is the only female superior officer working for the Department. (Defs.' 56.1 ¶ 22-23.)

In approximately January 2011, Bermudez identified two alternative female locker room options. (Zagaja Decl. ¶ 199.)

Plaintiff found both options to be unacceptable because they were located outside the secure police facilities and one of the options did not even have its own bathroom. (Valli Decl. Ex. 2, Zagaja Dep. at 146-48; Zagaja Decl. ¶¶ 199-200.) Hardwick testified that the Village offered to spend as much money as necessary to create a separate female superior officers' locker room, but that they simply could not put that locker room near the others due to space issues. (Valli Decl. Ex. 3, Hardwick Dep. at 223-24.) Colton testified that "the problem was the Village didn't have a budget to build a female supervisor's locker room. . . . The Village, at that time, was facing a deficit . . . . There was no funding for anything during that time." (Valli Decl. Ex. 5, Colton Dep. at 105.) Woodward testified that a separate female superior officers' locker room was never built. (Valli Decl. Ex. 1, Woodward Dep. at 231.)

At the end of September 2010, the officer plaintiff disciplined, ████ ████████, threw out a pair of Magnum work boots that belonged to plaintiff. (Valli Decl. Ex. 26, ████████ Discipline Overview; Zagaja Decl. ¶ 191.) During the following few weeks, ████████ placed harassing notes on plaintiff's locker, notes that plaintiff declares ████████ even admitted were directed at plaintiff. (Zagaja Decl. ¶ 196.) Plaintiff claims that, even though an independent arbitrator found ████████ guilty of discarding plaintiff's boots, the Village refused to reimburse plaintiff for her loss. (*Id.* ¶ 223.) Plaintiff also claims that, on November 16, 2011, ████████ referred to her as "Queen B." (*Id.* ¶ 202.) Plaintiff complained to her superior about being spoken to by a subordinate officer in that manner, but ████████ was never disciplined. (*Id.*) Also, because there was only one female locker room for both female superior and female subordinate officers, plaintiff had no choice but to continue to share a

locker room with ███ after these incidents. (*Id.*)

In 2011, plaintiff requested to work the night tour. Plaintiff's squad was changed and as a result, according to plaintiff, every one of plaintiff's shifts overlapped with ███. (Zagaja Decl. ¶ 225.) Plaintiff states that she complained to Horton and Bermudez about the overlap, but her squad was not changed. (*Id.*) Plaintiff no longer uses the female locker room at work and instead stores her personal items in a file cabinet drawer at the police desk because she "fear[s] that [███] may again discard [her] personal property." (*Id.*)

Plaintiff states that, in March 2010, Hardwick initiated an investigation into discipline applied by the command staff, including plaintiff, Woodward, and Gros. (*Id.* ¶ 215.) Plaintiff also states that Woodward informed her that Hardwick was making it a "Black/White thing and everything with him is race." (*Id.*)

At the Village of Freeport Board Meeting on April 5, 2010, Hardwick asked Bermudez, on his first day as Deputy Chief, to sit at the dais. (*Id.* at ¶ 216.) Plaintiff claims that, while serving as Deputy Chief, Hardwick never asked her to sit at the dais. (*Id.*) Plaintiff states that, while the general public was not admitted into the Board Meeting, Hispanic citizens were invited to attend, were provided bus service to the Village hall, and were permitted private entry through the rear of the building. (*Id.*) Plaintiff also states that the cameraman at the board meeting, who took direction from Hardwick, "honed in on [her] the entire night," which was "harassing and created a very uncomfortable situation" for plaintiff. (*Id.*)

Plaintiff states that, four months after her demotion, she was tasked both with training Bermudez and with performing command staff duties. (Zagaja Decl. ¶ 218.) Plaintiff was often asked to work in Bermudez's office or former chief Gros' office, causing plaintiff humiliation when workers walked by and saw her in an office she no longer occupied. (*Id.*) On June 25, 2010, Bermudez emailed plaintiff to inform her that she had been designated as the Department's records manager. (Valli Decl. Ex. 58, June 25 Email From Bermudez.) This new assignment required plaintiff to do physical labor in the basement of the Department. (Zagaja Decl. ¶ 219.) Plaintiff claims that she suffered a painful shoulder injury as a result of this physical labor, requiring her to participate in physical therapy for more than six months. (*Id.* ¶ 220.)

According to Colton, in the summer of 2010, the Department had a risk management company conduct a full background check of plaintiff in response to this litigation. (Valli Decl. Ex. 5, Colton Dep. at 143-44). In February 2011, plaintiff received an invitation from the Mayor's office addressing her as "Deputy Chief," despite the fact that she was demoted from that position one year earlier (Valli Decl. Ex. 59, Black History Month Event Invitation Letter; Zagaja Decl. ¶ 222). Plaintiff alleges that this was done purposefully "to further humiliate and harass [her] about [her] demotion." (Zagaja Decl. ¶ 222.)

Plaintiff states that, on March 1, 2012, Bermudez ordered her to serve as a street supervisor when a Sergeant on her tour was working light duty. (*Id.* ¶ 226.) Said Sergeant would work as watch commander in plaintiff's place. (*Id.*) According to plaintiff, the command staff had other options in this situation, such as payback tours, tour switches, and squad changes. Instead, plaintiff was directed to assume the role of street supervisor despite her rank,

experience, and tenure. (*Id.*) Being forced to relinquish her role of watch commander to a Sergeant was, in plaintiff's view, essentially another demotion. (*Id.*)

### 10. Plaintiff's Husband's Property

Plaintiff's husband owns property in Freeport and leases a lot on the property for storage. (Zagaja Decl. ¶ 162.) Plaintiff's husband leased the lot to Raymond Broems, the godfather of the son of Shawn Randall, an officer with the Village of Freeport Police Department. (Defs.' 56.1 ¶¶ 60-62.) Plaintiff states that, since she brought her complaint against the Village, the Village has targeted her husband's lot. (Zagaja Decl. ¶ 163.) According to plaintiff, the Village, by citing inapplicable zoning laws, forced Broems to leave his lot and no longer pay rent to plaintiff's husband. (*Id.*)

### 11. Bermudez's Reasons for Not Placing Zagaja on the Command Staff

At his deposition, Bermudez testified that he stopped telling Hardwick that he wanted plaintiff on the command staff once plaintiff filed her lawsuit. (Valli Decl. Ex. 4, Bermudez Dep. at 82.) Bermudez felt that he could no longer trust plaintiff because of the allegations in her complaint. (*Id.* at 82-83.) Bermudez testified to the following:

Q. After the lawsuit was filed, did you mention to the Mayor that you wanted Debbie on your command staff?

A. No.

Q. Why not?

A. I felt I couldn't trust her.

Q. That is because of the comment in the Complaint that you were the Junior Lieutenant?

A. Amongst others.

Q. And the fact that the allegation that you got this position was because you were minority?

A. Correct.

(*Id.* at 82-83.) Bermudez also testified that he could no longer trust plaintiff once he learned that she had tape-recorded conversations without his knowledge. (*Id.* at 85.) However, Horton testified at his deposition that he, like plaintiff, has taped an employee. (Valli Decl. Ex. 7, Horton Dep. at 53.) When asked why he taped an employee without the employee's knowledge, Horton testified that he did so to "protect the department as well as [himself]." (*Id.*) Horton became Deputy Chief.

### B. Procedural Background

Plaintiff filed the complaint in this action on August 11, 2010. Defendants answered on October 20, 2010. On January 23, 2012, defendants moved for summary judgment. Plaintiff submitted her opposition to defendants' motion for summary judgment on March 7, 2012. Defendants submitted their reply on March 21, 2012. The Court held oral argument on defendants' motion for summary judgment on May 15, 2012. The Court fully considered the submissions of the parties and, on August 13, 2012, issued a detailed oral ruling granting in part, and denying in part, defendants' motion. At the conference, the Court indicated that a written opinion may follow. This is that opinion.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only

grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109

F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. DISCUSSION

### A. Zagaja's Employment Discrimination Claims

Plaintiff alleges that she was subjected to race and gender discrimination when defendants (1) demoted plaintiff from Deputy Chief, (2) failed to promote plaintiff to Assistant Chief, (3) failed to promote plaintiff to Chief of Police, and (4) failed to create a separate female superior officers' locker room. As set forth below, defendants' motion for summary judgment is granted with respect to the locker room claim and is denied with respect to plaintiff's other claims of gender and race discrimination.

### 1. Applicable Law

Title VII prohibits discrimination against an employee based on his or her gender, race, and/or color.[6]  *See* 42 U.S.C. § 2000e-

2(a). Here, plaintiff claims she has been discriminated against by defendant on the basis of her race and gender.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000). In the absence of direct evidence of discrimination, claims for employment discrimination based on race, brought pursuant to Section 1981 or pursuant to Title VII, are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 464 (2d Cir. 2011) (Section 1981, Title VII and ADEA claims); *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (Title VII discrimination claim based on race, color, and national origin).

First, a plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job

---

[6] In addition to bringing claims under Title VII, plaintiff alleges discrimination under 42 U.S.C. Sections 1981 and 1983, and under the New York State Human Rights Laws ("NYSHRL"). Claims of discrimination brought under Section 1981, Section 1983, or NYSHRL are analyzed using the same framework as claims brought under Title VII, and the outcome in each instance will be the same as the outcome under Title VII. *See Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 464 (2d Cir. 2011) (noting that discrimination claims brought pursuant to § 1981 are analyzed under the

*McDonnell Douglas* burden-shifting analysis); *Kearney v. Cnty. of Rockland ex rel. Vanderhoef*, 185 F. App'x 68, 70 (2d Cir. 2006) (holding that plaintiff's "equal protection claim pursuant to 42 U.S.C. § 1983 for age-based employment discrimination fails for the same reasons that her ADEA and NYSHRL claims fail" under *McDonnell Douglas* analysis); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714-15 (2d Cir. 1996) (explaining that claims brought pursuant to the New York State Human Rights Laws are governed by the same standards as claims brought under Title VII).

satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp.*, 411 U.S. at 802, 802 n.13 (noting that elements of prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his or her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 2. Analysis

#### a. Demotion from Deputy Chief

Plaintiff has produced sufficient evidence to establish a *prima facie* case of race and gender discrimination with respect to defendants' demotion of plaintiff from Deputy Chief. Both plaintiff and defendants agree that plaintiff was qualified for the position, and that plaintiff is a member of a protected class based upon her race and

gender. Plaintiff has also produced evidence, discussed *supra*, that she was stripped of her title, supervisory authority, and command staff responsibilities, and that she lost both income and status. Plaintiff has also produced evidence from which a rational jury, construing the evidence in the light most favorable to plaintiff, could find an inference of discrimination. To the extent that defendants argue that plaintiff cannot bring a race discrimination claim because Bermudez is a White Hispanic male, the Court treats plaintiff's claim as also including one for national origin.[7] Plaintiff's evidence of discrimination, discussed *supra*, includes the following: (1) Colton's statement that Hardwick wanted to replace the then current command staff with "his people"; (2) Hardwick's statements regarding his desire to have more minorities advancing through the ranks; (3) Bermudez, a Hispanic male, was promoted to the Deputy Chief position even though he was less qualified and experienced than plaintiff; and (4) Hardwick sought to place Leftenant, a Black female, in the command staff even though Leftenant was unqualified. Construed in the light most favorable to plaintiff, the evidence in the record is sufficient to create an inference of

discrimination with respect to plaintiff's race, ethnicity, and gender.

Defendants have articulated legitimate, non-discriminatory reasons for their decision to demote plaintiff – namely, that plaintiff's contract had expired and that Hardwick wanted someone in the position with new ideas who was not part of the "old guard." However, construing this evidence in the light most favorable to plaintiff and considering it in conjunction with plaintiff's submitted evidence, including plaintiff's sworn statement that her contract for Deputy Chief only governed her benefits and not her right to the position, and all of the other aforementioned evidence put forth by both parties, there is sufficient evidence in the record to raise a genuine issue of material fact as to whether defendants' proffered reason for demoting plaintiff constitutes a pretext for race, ethnicity, and gender discrimination. Therefore, defendants' motion for summary judgment on this ground is denied.

b. Failure to Promote to Assistant Chief

Plaintiff has produced sufficient evidence to establish a *prima facie* case with respect to defendants' failure to promote plaintiff to Assistant Chief of Police. Plaintiff has produced evidence of her qualifications for the position, defendants agree that plaintiff is a member of a protected class with respect to her race and gender, and it is clear that plaintiff is a member of a protected class with respect to her ethnicity. Plaintiff has presented evidence of an adverse employment action – namely, that she was not promoted to Assistant Chief and that the position remains vacant. Plaintiff has produced evidence giving rise to an inference of discrimination, including evidence that Hardwick sought to appoint Leftenant, who Bermudez testified was grossly unqualified for a command staff

---

[7] At the conference on August 13, 2012, the Court permitted plaintiff to file an amended complaint including this claim. Plaintiff filed an amended complaint on August 21, 2012. The Court notes that a White non-Hispanic plaintiff can bring a Title VII claim on the ground that a person who is Hispanic received a position over the plaintiff. *See, e.g.*, *Cameron v. Saint Francis Hosp. & Med. Cent.*, 56 F. Supp. 2d 235, 238 (D. Conn. 1999) ("In *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997), the Second Circuit held that the plaintiff, a White American male of Eastern European origin, had stated a claim for national origin discrimination under Title VII, when he alleged that he was not hired as Director of the Spanish Language Program at Columbia University whereas a male of Hispanic descent was hired. Plaintiff's claims in this case are not unlike those in *Stern*.").

position, as Assistant Chief of Police. Plaintiff has also introduced evidence that the Board of Trustees would not ratify Leftenant and that Hardwick consequently created a new position for her that encompassed some of the tasks normally handled by an Assistant Chief.

In their briefs, defendants have failed to articulate a legitimate, non-discriminatory reason for failing to promote plaintiff to the Assistant Chief position. Assuming, however, that defendants posit the same reasons for failing to promote plaintiff as they stated in defense of their decision to demote plaintiff from Deputy Chief, the Court concludes, on the same grounds as stated *supra*, that there is a genuine issue of material fact as to whether those reasons are a pretext for race, ethnicity, and gender discrimination.

c. Failure to Promote to Police Chief

Plaintiff has produced sufficient evidence to establish a *prima facie* case with respect to defendants' failure to promote plaintiff to Chief of Police. With respect to plaintiff's qualifications for the position, plaintiff has produced evidence that it was common knowledge that the top two scorers on the civil service exam did not want the position of Police Chief, and that if Hardwick had canvassed the candidates, plaintiff would have been among the top three scorers on the exam, and thus eligible for the position. Plaintiff has produced evidence that she suffered an adverse employment action – the failure to be promoted to chief. In addition, the evidence discussed *supra*, including evidence of Hardwick's efforts to re-vamp the civil service exam to allow Bermudez to take the test and of Hardwick calling Bermudez "Chief" even before Bermudez was eligible to sit for the exam, is sufficient to create an inference of discrimination.

Defendants have produced evidence that plaintiff was not in the top three scorers on the exam, that plaintiff did not share Hardwick's vision for the Department, and that Bermudez "moved" Hardwick in his interview, and that plaintiff was therefore not selected for the Chief of Police position. Plaintiff, however, has produced evidence that Hardwick did not canvass the candidates, that Hardwick did not ask plaintiff to recount her vision for the Department during her interview, but simply testified that plaintiff wanted the same things as him, and that Bermudez spoke very little in his interview. This evidence, along with all of the evidence discussed *supra*, is sufficient to create a genuine issue of material fact as to whether defendants' proffered reasons for not selecting plaintiff as Chief of Police are a pretext for discrimination.

d. Female Superior Locker Room

The uncontroverted evidence in the record demonstrates that there is one female officers' locker room in the Village – there are not separate locker rooms for female superior officers and female subordinate officers as there are for those two classes of male police officers. It is also undisputed that the Village offered to construct a separate female superior officers' locker room for plaintiff in two locations, the custodial work area or the building department, but plaintiff rejected those offers. Although plaintiff attempts to raise disparities between the proposed female superior officers' locker rooms and the existing male superior officers' locker room, those disparities are not sufficiently adverse as a matter of law.

Even assuming *arguendo* that the disparities were materially adverse, the defendants have articulated legitimate, non-discriminatory reasons as to why the two

options provided to plaintiff were the only practical options, given space constraints and cost concerns. Even construing the evidence in the light most favorable to plaintiff, no rational jury could conclude that defendants' proffered reasons were a pretext for gender discrimination. Thus, summary judgment with respect to this portion of the claim is granted.

## B. Zagaja's Hostile Work Environment Claim

Plaintiff has also asserted a hostile work environment claim on the basis of race and gender. For the reasons set forth below, summary judgment in favor of the defendants is granted with respect to this claim.

### 1. Applicable Law

Defendants argue that the complaint fails to state a plausible hostile work environment claim under Title VII and the NYSHRL because the allegedly hostile work conduct, even if true, cannot support a hostile work environment claim as a matter of law because it was not sufficiently severe or pervasive. (Def.'s Br. at 6-9.) As set forth below, the Court agrees. Although plaintiff correctly notes that a single act can be severe enough under certain circumstances to create a hostile work environment (Pl.'s Opp. at 8-9), that is not the case here.

Under Title VII, a hostile work environment is established by a plaintiff showing that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir.

2003). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000); *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 451 (S.D.N.Y. 2011) (same).

The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted). In addition, a plaintiff seeking to establish a hostile work environment claim must demonstrate that "a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). Other factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148. The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, . . . . [t]he environment need not be 'unendurable' or 'intolerable.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace." *Feingold*, 366 F.3d at 150 (internal quotations marks omitted).

The standard that governs hostile work environment claims brought under Title VII also governs hostile work environment claims brought under the NYSHRL. *See, e.g.*, *Cruz*, 202 F.3d at 565 n.1 (explaining

that the analysis of claims brought under the state human rights laws is the same as the analysis used in Title VII claims); *Collier v. Boymelgreen Developers*, No. 06–CV–5425 (SJ), 2007 WL 1452915, at *4 (E.D.N.Y. May 17, 2007) ("The Court's consideration of claims brought under [NYSHRL] [ ] parallels the analysis used for Title VII claims.").

## 2.  Analysis

Although plaintiff asserts that a hostile work environment existed in a one-sentence, conclusory manner, (Pl.'s Opp. at 23), the Court has fully considered all of the evidence in the record with respect to this claim. Plaintiff has not produced evidence of conduct based upon race, ethnicity, or gender apart from the discrete acts of alleged discrimination with respect to the individual claims discussed *supra*. There is no evidence of comments, actions, or conduct attributable to race, ethnicity, or gender sufficient to rise to the level of a hostile work environment, and no rational jury could conclude otherwise.

Although plaintiff has pointed to evidence of disagreement with her co-workers, including ███████, disagreement with co-workers is not enough to satisfy the requirements of a hostile work environment claim. Plaintiff has also produced evidence with respect to ██████ throwing out plaintiff's boots and the Village failing to consequently discipline ██████, but these acts are not sufficiently severe or pervasive enough for a rational jury to find that a hostile work environment existed.

## C.  Zagaja's Retaliation Claim

Plaintiff has also asserted a retaliation claim with respect to various actions taken by defendants. For the reasons set forth below, defendants' motion for summary judgment with respect to plaintiff's retaliation claim is denied.

## 1.  Applicable Law

The *McDonnell Douglas* burden shifting analysis also applies to plaintiff's retaliation claims under Title VII. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII. . . . The same standards and burdens apply to claims of retaliation in violation of the ADEA." (citations omitted)).

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he or she engaged in a protected activity; (2) defendant was aware of that activity; (3) plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). An employment action is considered adverse if "the employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Under this framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of

persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)). "Title VII is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Terry*, 336 F.3d at 140-41 (internal quotations and citations omitted).

As noted above, it is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986)); *De Cintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 116 n.8 (2d Cir. 1987). Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action. *Sumner*, 899 F.23d at 209. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *Id.*

2. Analysis

Plaintiff has produced evidence that she engaged in protected activity both in complaining about the shared female officers' locker room and in filing this lawsuit. Plaintiff has also produced evidence that defendants were aware of this activity. Plaintiff has produced evidence of an adverse employment action, in that she has not been promoted to a command staff position, among other things.[8] Plaintiff has also produced evidence that shows a causal connection between her protected activity in filing the instant lawsuit and defendants' failure to promote her to Assistant Chief. For example, Bermudez testified that he stopped recommending that plaintiff be promoted when he decided that he could no longer "trust" plaintiff because of the allegations made in her complaint. Though defendants argue that plaintiff has not been promoted to a command staff position because she taped conversations with employees without their knowledge, plaintiff has produced evidence that Horton similarly taped conversations and was nevertheless promoted to Deputy Chief. Plaintiff has produced sufficient evidence to create a disputed issue of fact as to whether defendants' proffered reason for declining to promote plaintiff is a pretext for retaliation.

For the reasons set forth above, summary judgment is granted in defendants' favor with respect to (1) plaintiff's employment discrimination claim regarding the female superior officers' locker room and (2) plaintiff's hostile work environment claim. Summary judgment is denied with respect to (1) plaintiff's employment discrimination claims regarding her demotion from Deputy Chief, defendants' failure to promote plaintiff to Assistant Chief, and defendants' failure to promote plaintiff to Chief of Police, and (2) plaintiff's retaliation claim.[9]

---

However, as the Court has determined that plaintiff's retaliation claim must go forward based on the failure to promote to Assistant Chief, the Court need not analyze each action.

[9] Defendants argue that plaintiff's Title VII claims against Hardwick must be dismissed because there is no individual liability under Title VII. The Court agrees that there is no individual liability under Title VII. Therefore, any claims under Title VII against Hardwick must be dismissed. *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (affirming dismissal of Title VII claims against individual defendants,

---

[8] Plaintiff also alleges other adverse employment action as resulted from her protected activity.

### D. Qualified Immunity

Hardwick argues, in the alternative, that he is entitled to qualified immunity with respect to plaintiff's Section 1981, Section 1983, and NYSHRL claims. For the reasons set forth below, however, the Court denies summary judgment on this ground because disputed issues of fact exist that must be resolved before the issue of qualified immunity may be decided in this case. As discussed in length *supra*, in relation to plaintiff's discrimination and retaliation claims, the Court finds that plaintiff has sufficiently set forth evidence from which a rational jury could, if they were to accept the evidence as true and draw all reasonable inferences in plaintiff's favor, find intentional discrimination and retaliation. Thus, the disputed issues of fact that exist with respect to the discrimination and retaliation claims also preclude summary judgment with respect to Hardwick on qualified immunity grounds.

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). The Second Circuit has held that "a right is clearly established if (1)

the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal citations omitted).

Here, if the factual disputes are all resolved in plaintiff's favor and the jury concludes that Hardwick intentionally discriminated against plaintiff and retaliated against her in violation of Section 1981, Section 1983, and the NYSHRL in the manner described by plaintiff, qualified immunity would not protect Hardwick. *See, e.g.*, *Kercado-Clymer v. City of Amsterdam*, 370 F. App'x 238, 242 (2d Cir. 2010) (denying individual defendant's interlocutory appeal on qualified immunity grounds with respect to plaintiff's retaliation claim where plaintiff established *prima facie* case of retaliation and the right to be free from retaliation was clearly established at the time of the adverse employment action); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 130 (2d Cir. 2004) ("We find that the two remaining individual defendants in this case are not entitled to qualified immunity. It was eminently clear by 2001, when the alleged discrimination took place, both that individuals have a constitutional right to be free from sex discrimination, and that adverse actions taken on the basis of gender stereotypes can constitute sex discrimination."); *Griffin v. New York*, 122 F. App'x 533, 534-35 (2d Cir. 2004) (dismissing interlocutory appeal from a denial of qualified immunity where plaintiff produced evidence of discrimination that violated plaintiff's right

---

"because individuals are not subject to liability under Title VII"); *Everson v. N.Y.C. Transit Auth.*, No. 02-CV-1121 (ENV), 2007 WL 539159, at *18 (E.D.N.Y. Feb. 16, 2007) (dismissing Title VII claims against individual supervisor defendants; *Copeland v. Rosen,* 38 F. Supp. 2d 298, 302 (S.D.N.Y. 1999) ("[I]ndividual employees may not be held personally liable under Title VII, even if they are supervisory personnel with the power to hire and fire other employees.").

"to be free from discrimination and retaliation in the workplace" based on race); *see generally Iqbal v. Hasty*, 490 F.3d 143, 174 (2d Cir. 2007) (concluding that plaintiff's racial, ethnic, and religious discrimination claims could not be dismissed on qualified immunity grounds given that the allegations in plaintiff's complaint were sufficient to state a claim of animus-based discrimination). Therefore, summary judgment for Hardwick on qualified immunity grounds, with respect to plaintiff's Section 1981, Section 1983 and NYSHRL claims, is unwarranted.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. The Court grants defendants' motion with respect to (1) plaintiff's claim of gender discrimination as it relates to the female superior officers' locker room and (2) plaintiff's hostile work environment claim. Summary judgment is denied with respect to (1) plaintiff's employment discrimination claims regarding her demotion from Deputy Chief, defendants' failure to promote plaintiff to Assistant Chief, and defendants' failure to promote plaintiff to Chief of Police, and (2) plaintiff's retaliation claim. Hardwick's motion for summary judgment on qualified immunity grounds is also denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: November 20, 2012
        Central Islip, NY

* * *

Plaintiff is represented by Robert John Valli, Jr., Aneeba Rehman, and Sara Wyn Kane, Valli Kane & Vagnini LLP, 600 Old Country Road, Suite 519, Garden City, N.Y. 11530. The attorneys for the defendants are Stanley A. Camhi, Christopher D. Palmieri, and Jessica M. Baquet, Jaspan Schlesinger LLP, 300 Garden City Plaza, Garden City, N.Y. 11530.